IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND DIVISION

| | | |
|---|---|---|
| YADIRA URANGA, | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. 7:20-CV-21 |
| v. | § | |
| | § | |
| MIDLAND ODESSA URBAN TRANSIT | § | |
| DISTRICT, | § | |
| | § | |
| CITY OF ODESSA, TEXAS, | § | |
| | § | |
| CITY OF MIDLAND, TEXAS, | § | |
| | § | |
| RATP DEV USA, INC., and | § | |
| | § | |
| MIDLAND-ODESSA TRANSIT | § | |
| MANAGEMENT, INC., | § | |
| | § | |
| Defendants. | § | |

---

## PLAINTIFF'S ORIGINAL COMPLAINT

---

## INTRODUCTION

1.      Plaintiff Yadira Uranga ("Ms. Uranga" or "Plaintiff") is a resident of Odessa,

Texas, and is a person with long-term visual impairments, who uses a service animal as a guide.

Ms. Uranga brings this action against (1) the Midland Odessa Urban Transit District ("MOUTD"),

a public entity that operates a transportation system in the cities of Odessa and Midland, Texas,

(2) the Cities of Midland, Texas, and Odessa, Texas, public entities that created and retained

control over the MOUTD, (3) and RATP Dev USA ("RATP") and Midland-Odessa Transit

Management, Inc. ("MOTM") as subcontractors retained by, Midland, Odessa, and MOUTD to

oversee day-to-day operations of MOUTD.  Ms. Uranga brings this action against the above

entities under Title II of the Americans with Disabilities Act of 1990, as amended by the Americans

with Disabilities Amendments Act of 2008 ("ADA"), 42 U.S.C. §§ 12101, and its implementing regulations, 28 C.F.R. §§ 35.101, *et seq*., 49 C.F.R. §§ 37.1, *et seq.*, and Section 504 of the Rehabilitation Act of 1973 as amended ("Rehabilitation Act"), 29 U.S.C. § 794, and its implementing regulations, 49 C.F.R. §§ 27.1, *et seq*.

2.      The cities of Midland and Odessa created and retained control over the MOUTD to provide public transportation.

3.      MOUTD operates a fixed-route bus system in and between the cities of Odessa and Midland, Texas, which consists of several bus line routes.  Pursuant to the ADA, the MOUTD must provide complementary paratransit service to persons with disabilities who cannot access the fixed-route due to their disabilities because it operates a fixed route bus system.  Ms. Uranga is one such individual and was already deemed paratransit eligible by MOUTD before the filing of this lawsuit.

4.      Complimentary paratransit service means transit providers, such as MOUTD, must provide direct pick up and drop off transportation (like a taxi-service) to paratransit riders.  The transit authority is only obligated to provide this direct transportation service to locations that are within three-fourths of a mile of fixed-route bus lines (on each side of the bus line).  That is, both the pick-up and the drop-off locations must be within three-quarters of the nearest fixed-route bus line operated by the transit authority.

5.      MOUTD operates a fixed-route bus lines in the cities of Midland and Odessa. MOUTD provides complimentary paratransit services to these bus lines.

6.      Two of MOUTD's fixed-route bus lines start respectively in the cities of Midland and Odessa and then run between the two cities, connecting them.  MOUTD, however, does not provide complimentary paratransit services along these fixed-route bus lines.  That is, there is no

way for a MOUTD paratransit rider to receive direct paratransit service between the cities of Odessa to Midland.

7. Ms. Uranga is a qualified paratransit eligible rider with MOUTD. Ms. Uranga lives in Odessa. MOUTD will not provide direct paratransit transportation for Ms. Uranga between the cities of Midland and Odessa in one continuous trip.

8. MOUTD states it does not need to provide paratransit between Midland and Odessa because the fixed-route bus lines that run between Midland and Odessa are what MOUTD considers a "commuter bus service." Transit authorities do not need to provide paratransit services adjacent to bus systems that are used solely as a "commuter bus service." MOUTD bus system, however, is not used solely as a commuter bus service. Therefore, MOUTD must provide paratransit service for Ms. Uranga between the cities of Midland and Odessa.

9. In sum, Defendant MOUTD violated and continues to violate Ms. Uranga's rights under the ADA and the Rehabilitation Act by refusing to provide her paratransit service between Midland and Odessa (and vice-versa) in one continuous, non-stop trip. Ms. Uranga therefore seeks declaratory and injunctive relief requiring MOUTD to provide her paratransit service between Odessa and Midland, Texas.

10. The cities Midland and Odessa created and retain control over MOUTD and are therefore responsible for MOUTD's actions and/or inactions under the ADA and Rehabilitation Act.

11. RATP and MOTM are subcontractors retained by the cities Odessa and Midland and MOUTD to oversee day-to-day operations of MOUTD. RATP and MOTM are responsible for MOUTD's actions and/or inactions under the Rehabilitation Act.

## JURISDICTION

12.     Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1343 because Ms. Uranga's claims involve federal questions arising under Title II of the ADA and the Rehabilitation Act.

13.     This Court has jurisdiction over Mr. Uranga's request for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal rules of Civil Procedure. Injunctive relief is authorized by 28 U.S.C. § 2202, 42 U.S.C. § 1983, and Rule 65 of the Federal Rules of Civil Procedure.

## VENUE

14.     Venue of this action is proper pursuant to 28 U.S.C. § 1391(b)(2) because all of the events and omissions complained of arise within this district and division, specifically, Midland and Odessa, Texas.

## PARTIES

15.     Plaintiff Yadira Uranga resides in Odessa, Texas.

16.     Defendant MOUTD is the entity that provides, operates, and administers public bus transportation in Odessa and Midland, Texas.  Based on a request for public information to the City of Midland, Texas, the chief executive officer for the MOUTD is Transit Board Chairperson Sharla Hotchkiss.  MOUTD, a public entity, may be served through its Transit Board Chairperson Sharla Hotchkiss, Midland Odessa Urban Transit District, 10300 Younger Road, Midland, Texas 79711 or at her personal residence available via public record.

17.     Defendant City of Odessa, Texas, is the public entity and political subdivision of Texas that created and retains control over MOUTD.  Process may be served on Odessa through its City Secretary, Norma Aguilar-Grimaldo, at 411 W. 8th Street, Odessa, Texas 79761.

18.     Defendant City of Midland, Texas, is the public entity and political subdivision of Texas that created and retains control over MOUTD.  Process may be served on Midland through its City Secretary, Amy Turner, at 300 N. Loraine, 3rd floor, Midland, Texas 79702.

19.     Defendant RATP is a domestic for-profit corporation that may be serviced through its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, at 322 E. 7th Street, Suite 620, Austin, Texas 78701.

20.     Defendant MOTM is a domestic for-profit corporation that may be served through its registered agent Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, at 322 E. 7th Street, Suite 620, Austin, Texas 78701.

## STATEMENT OF FACTS

### I.     Transportation Under the Americans with Disabilities Act

21.     On July 12, 1990, Congress enacted the ADA, 42 U.S.C. § 12101, *et seq*. (ADA), establishing the most important civil rights laws for persons with disabilities in our nation's history.[1]  In passing the ADA, Congress found that persons with disabilities are a discrete and insular minority who had been systemically discriminated against.  *Tennessee v. Lane*, 541 U.S. 509 (2004).

22.     Finding the then-existing laws to be "inadequate" to combat the "pervasive problems of discrimination that people with disabilities are facing," S. Rep. No. 116, 101st Cong., 1st Sess. 18 (1989), H.R. Rep. No. 485(II), 101st Cong., 2d Sess. 47 (1990), Congress recognized a need for "omnibus civil rights legislation" that would "finally set in place the necessary civil

---

[1] In 2008, Congress amended the ADA. The Americans with Disabilities Amendments Act of 2008, 42 U.S.C. §§ 12101, *et seq.*, where the definition of disability was expanded.  For the purposes of this complaint, ADA 2008 amendments did not change any of the core transportation requirements discussed later in this complaint.

rights protections for people with disabilities." S. Rep. No. 116, 101st. Cong., 1st Sess. 19 (1989); H.R. Rep. No. 485(II), 101st Cong., 2d Sess. 40 (1989). In reaching that determination, Congress concluded:

> [T]here is a compelling need to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities and for the integration of persons with disabilities into the economic and social mainstream of American life. Further, there is a need to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities.

S. Rep. No. 116, 20; H.R. Rep. No. 485(II).

23.   Therefore, a major purpose of the ADA is to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities, and to provide clear, strong, consistent and enforceable standards addressing discrimination against individuals with disabilities. 42 U.S.C. § 12101(b)(1)&(2).

24.   Congress's finding and intention in enacting the ADA extended to many aspects of American life, transportation among them. The ADA sets forth Congress's finding that discrimination against individuals with disabilities persisted in a number of "critical areas," including transportation. 42 U.S.C. § 12101(a)(3). In fact, one of the areas of critical concern to Congress was the availability of public transportation to persons with disabilities because, without mobility, the carry-on of one's life is seriously disrupted. H.R. Rep. No. 485, pt. 2, at 58 (1990).

25.   The legislative history of the ADA indicates that transportation was an area of particular concern to Congress in passing the major piece of disability rights legislation. The House Committee on Education and Labor, for example, described transportation as "the linchpin which enables people with disabilities to be integrated and mainstreamed into society." H.R. Rep. No. 485(II) at 37 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 319.

26.     Similarly, the House Committee on Energy and Commerce stated that transportation "is a veritable lifeline to the economic and social benefits that our Nation offers its citizens [….] For this reason, the National Council on Disability has declared that 'accessible transportation is a critical component of a national policy that promotes self-reliance and self-sufficiency of people with disabilities.'"  H.R. Rep. No. 485(IV) at 25, (1990), reprinted in 1990 U.S.C.C.A.N. 512, 514.

27.     Title II of the ADA covers governmental entities.  Title II of the ADA provides that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

28.     Title II of the ADA and implementing regulations establishes a robust framework of transportation requirements for persons with disabilities.  Title II of the ADA prohibits state and local governments that operate public transit agencies (hereinafter "transit agencies") from discriminating against qualified individuals with disabilities in transportation services offered to the public.  Title II, Subtitle B of the ADA applies to state and local governments' transit agencies.  42 U.S.C §§ 12141, *et. seq*.

29.     Transit agencies traditionally operate a fixed-route bus system.  A transit agency's fixed-route system is defined as "a system of providing designated public transportation on which a vehicle is operated along a prescribed route according to a fixed schedule" and does not require individuals to request service in advance.  42 U.S.C. § 12141(3).

30.     Transit agencies operating fixed-route transportation systems are required to provide paratransit service for individuals with disabilities as a complement to the fixed-route system.  42 U.S.C. § 12143(a).  Paratransit provides transportation to individuals unable to use

public transportation routes that are available to the public.  Further, complimentary paratransit is not same-day service as is the case with the fixed-route system.  Qualified paratransit riders must schedule their trips 24-hours in advance.

31.     Individuals must qualify for paratransit services.  42 U.S.C. § 12143(c)(1)(A).

32.     Congress instructed the Secretary of Transportation to issue regulations providing minimum service criteria for paratransit service.  42 U.S.C. § 12143(b) & (c).

33.     A public entity that operates a fixed route must "provide complementary paratransit service to origins and destinations within corridors with a width of three-fourths of a mile on each side of each fixed route."  49 C.F.R. § 37.131(a)(1)(i).

34.     The basic bus system service area is a corridor with a width of three-quarters (¾) of a mile on each side of each fixed route.  At the end of a route, there is a semicircular "cap" on the corridor, consisting of a three-quarter mile radius from the end point of the route to the parallel sides of the corridor.  The fixed-route bus system service area is a corridor that is three-quarters of a mile on each side of the fixed-route bus line.  Complementary paratransit must provide service to any origin or destination point within a corridor fitting this description around any route in the bus system.  49 C.F.R. Pt. 37, App. D, Construction and Interpretation of Provisions of 28 CFR Part 37, Effective April 16, 2014.

35.     Public entity transit providers do not need to provide complimentary paratransit services to a fixed-route system if the system is a "commuter bus service."  49 C.F.R. § 37.121(c).  This exception only applies if the system provides "*solely* commuter bus service."  42 U.S.C.A. § 12143 (emphasis added to original).

36.     In implementing the ADA transit regulations, the Federal Transit Administration (FTA) defined a commuter bus service as a "fixed route bus service, characterized by service

predominantly in one direction during peak periods, limited stops, use of multi-ride tickets, and routes of extended length, usually between the central business district and outlying suburbs. Commuter bus service may also include other service, characterized by a limited route structure, limited stops, and a coordinated relationship to another mode of transportation."  49 C.F.R. § 37.3 (definitions).

37.     The definition of "commuter bus service" is important because the ADA does not require complementary paratransit be provided with respect to commuter bus service operated by public entities.  The rationale that may be inferred for the statutory exemption for this kind of service concerns its typical characteristics (e.g., no attempt to comprehensively cover a service area, limited route structure, limited origins and destinations, interface with another mode of transportation, limited purposes of travel).  These characteristics can be found in some transportation systems other than bus systems oriented toward work trips.  For example, bus service that is used as a dedicated connecter to commuter or intercity rail service, certain airport shuttles, and university bus systems share many or all of these characteristics.  49 C.F.R. Pt. 37, App. D, Construction and Interpretation of Provisions of 28 CFR Part 37, Effective April 16, 2014.

## II.     Creation of MOUTD and Hiring of Its Private Subcontractors

38.     In 2001, the Cities of Midland and Odessa entered into an Interlocal Agreement to create an urban transit district under Chapter 458 of the Texas Transportation Code.

39.     The urban transit district Midland and Odessa created was the Midland Odessa Urban Transit District, or the "MOUTD."

40.     The agreement specified that MOUTD "shall be exclusively governed by the City Councils of Midland and Odessa" unless the city councils of Midland and Odessa delegate the authority to a Board.

41.     A Transit Board governs the MOUTD. However, the cities of Odessa and Midland retain control over MOUTD. Examples of this control include, the cities of Midland and Odessa select the members of the MOUTD Transit Board. Additionally, the cities, through their respective city councils, approve budgets and route changes for MOUTD.

42.     RATP and MOTM serve as private subcontractors and local managers of the day-to-day operations of the MOUTD transportation services.   RATP specifically manages and operates MOUTD and maintains MOTM to employ transit employees.

43.     MOUTD, the cities of Midland and Odessa, RATP and MOTM, are recipients of federal financial assistance, in particular, via the U.S. Department of Transportation ("DOT") and the Federal Transit Administration ("FTA").   Defendants use these federal funds and grants to operate and maintain the public transportation system Ms. Uranga uses and intends to use as the basis of this complaint.

III.     **MOUTD's Public Transportation Bus System**

A.  **Fixed-Route Bus Lines**

44.     MOUTD has the legal authority to operate in the jurisdictions of the cities of Midland and Odessa, to travel back and forth between the two cities, and to operate in areas between the cities.

45.     MOUTD administers an interconnected bus system with buses running along routes lines with pre-designated bus stops that serve the cities of Midland and Odessa, as well as areas between the two cities.

46.     MOUTD operates six fixed-route bus lines inside Midland.  MOUTD labels these fixed-route bus lines "M1," "M2," "M3," "M4," "M5," and "M6." MOUTD operates an additional

fixed route bus line that takes passengers to locations in Midland as well as locations in and near the Airport. MOUTD calls this fixed-route line the Midland Connect.

47.     MOUTD operates six fixed-route bus lines inside Odessa.  MOUTD names these fixed-route bus lines individually, "O1," "O2," "O3," "O4," "O5," and "O6." MOUTD operates an additional fixed route bus line that takes passengers to locations in Odessa as well as locations in and near the Airport. MOUTD calls this fixed-route line the Odessa Connect.

48.     When viewed in its entirety, MOUTD operates all its fixed route bus lines, M1-M6, O1-06, the Midland Connect, and the Odessa Connect, as one interconnected, comprehensive bus system service.  A rider can enter the MOUTD bus system at any bus stops along the M1-M6, O1-O6, the Midland Connect, or the Odessa Connect, and travel and transfer onto other lines throughout the entire system without ever leaving the bus system.

49.     MOUTD charges $1.25 for its fixed-route bus rides on the M1-M6, O1-O6, the Midland Connect, and Odessa Connect.

50.     MOUTD offers all-day passes for its fixed-route bus rides on the M1-M6, O1-O6, the Midland Connect, and Odessa Connect.

51.     Defendant's fixed-route buses described above operate from 6:15 a.m. until 6:15 p.m. Monday through Friday (with some Saturday service), whether during peak or non-peak ridership times.

**B.  The "Odessa Connect" and the "Midland Connect" Bus Lines**

52.     The "Midland Connect" and "Odessa Connect" are fixed route bus lines that are part of MOUTD's overall comprehensive bus system, not separate or apart from the M1-M6 and O1-O6 bus lines.

53.     The "Midland Connect" and "Odessa Connect" serve several important destination points along their fixed-routes, such as the University of Texas Permian Basin Building, Texas Department of Public Safety, various major shopping centers, and a Veteran's medical clinic, and do not predominantly run in one direction.

54.     The "Midland Connect" serves the following pre-determined buses stop in the following order:

(1) Greyhound station (where MOUTD's main office is located), 2624 E. 8th Street, Odessa Texas 79761;

(2) University of Texas Permian Basin Building – north, 1310 FM 1788, Midland, Texas 79707;

(3) Oxy Building, 5716 Deauville Blvd., Midland, Texas 79706;

(4) Sam's Club, 1500 Tradewinds Blvd., Midland, Texas 79706;

(5) Midland Park Mall, 4511 N. Midkiff Road, Midland, Texas 79705;

(6) Walmart Supercenter, 4517 Midland Dr., Midland, Texas 79707;

(7) H-E-B- Supermarket, 5407 Andrews Hwy., Midland, Texas 79706;

(8) Texas Department of Safety Mega Center, 2800 Wright Dr., Midland, Texas 79706;

(9) Midland International Airport, 9506 La Force Blvd., Midland, Texas 79706; and then returning to

(10)    Greyhound station at 2624 E. 8th St. Odessa, Texas 79761.

55.     The "Midland Connect" operates during peak and non-peak ridership hours, beginning its fixed-route tours at 6:45 a.m.  MOUTD used to operate the "Midland Connect" during only peak transit hours in the morning (6:45 a.m. to 9:40 a.m.) and peak transit hours in the

afternoon-evening (2:40 p.m. to 6:40 a.m.), but changed the "Midland Connect" to a full service fixed-route schedule.

56.     The "Odessa Connect" fixed-route buses stop at the following pre-determined locations in the following order:

(1) Greyhound station (where MOUTD's headquarters is located), 2624 E. 8th Street, Odessa Texas 79761;

(2) Sunset Lodge, 7701 E, TX-191, Odessa, TX 79762;

(3) Chimney Rock Shopping Center, 6201 TX-191 Frontage, Odessa, TX 79762;

(4) Music City Mall, 4101 E. 42nd St. Odessa, Texas 79762;

(5) Conn's Home Plus, 6976 E. TX-191, Odessa, Texas 79765;

(6) ProCare VA Internal Medicine Clinic, 8050 TX-191 Frontage, Odessa, Texas 79765;

(7) Midland International Airport, 9506 La Force Blvd., Midland, Texas 79706;

(8) Texas Department of Safety Mega Center, 2800 Wright Dr., Midland, Texas 79706; and then returning to

(9) Greyhound station at 2624 E. 8th St. Odessa, Texas 79761.

57.     The "Odessa Connect" operates during peak and non-peak ridership hours, beginning its fixed-route tours at 6:45 a.m. and ending at 6:40 p.m.  MOUTD used to operate the "Odessa Connect" during peak transit hours in the morning (6:45 a.m. to 9:40 a.m.) and peak transit hours in the afternoon-evening (2:40 p.m. to 6:40 a.m.), but changed the "Odessa Connect" to a full service fixed-route schedule.

58.     The "Midland Connect" and the "Odessa Connect" overlap and intersect at the following bus stops: (1) Texas Department of Safety Mega Center, 2800 Wright Dr., Midland,

Texas 79706; (2) the Midland International Airport; and (3) the Greyhound station. Riders can transfer between the two bus lines at these three bus stops.

59.     "Midland Connect" and "Odessa Connect," riders can transfer to the M1-M6 and O1-O6 fixed route bus lines. For example, at the Midland Park Mall, 4511 N. Midkiff Road, Midland, Texas, riders can disembark from the "Midland Connect" and then transfer to the M2, M3, or M4 bus lines.

60.     The "Midland Connect" and the "Odessa Connect" do not provide service to any suburban outlining areas of Midland or Odessa; only transportation between the two cities.

61.     Neither the "Midland Connect" nor the "Odessa Connect" are dedicated and coordinated connecters to other commuter or intercity rail services, certain airport shuttles, or a university bus system.

62.     Riders can purchase all-day tickets for the two Connects; however, this is no different for any of the other fixed-route bus lines operated by MOUTD. Further, the price for the all-day ticket passes is the same for all fixed-routes; there is no reduced price for the all-day passes for the two Connects.

63.     MOUTD does not operate the "Midland Connect" or the "Odessa Connect" in a formal coordinated relationship to another mode of transportation. MOUTD does not have a formal agreement with the Midland International Airport to provide coordinated travel between MOUTD and the airport. For example, when the buses for the "Midland Connect" and "Odessa Connect" make their trips to the Midland International Airport, riders can ask the MOUTD bus to stop at the rider's desired location. These unscheduled stops are not coordinated with the Midland International Airport. Nor is there any coordinated relationship or memorandum of understanding between MOUTD and the Midland International Airport to provide transportation at drop-off or

pick-up points where airport shuttle buses provide further transportation inside the airport complex.

64.     MOUTD stops at a Greyhound terminal, but does not provide coordinated travel with Greyhound.  There is no formal referral agreement or memorandum of understanding to transfer passengers between MOUTD and Greyhound.  There is also no known MOUTD schedule keyed and dedicated to Greyhound's schedule to help facilitate a transfer interface.  Rather, MOUTD and Greyhound only have an agreement to share a common workspace.  Further, a "Midland Connect" or "Odessa Connect" ride ticket does not transfer to Greyhound services.

65.     MOUTD also comprehensively and broadly covers the areas its serves with the "Midland Connect" and "Odessa Connect."  The "Midland Connect" and "Odessa Connect" service its areas with strategic and selective population centered fixed-stops that helps comprehensively cover its designated area.  Where both Connects do not stop, there is substantially undeveloped vacant land or industrial locations.  There are few commercial non-industrial uses, and where there are such uses, they range from cemeteries to a few churches.  There is also a very low population density in the areas the Connects do not stop relative to the areas by the Connects. The Connects bypass a relatively new shopping outlet that includes restaurants, six (6) hotels, and a car dealership.  An event and performing arts centers are also bypassed, but the vast majority of events held at these locations are held after bus services end.

### C.  MOUTD's EZ Express

66.     MOUTD operates an express service that runs only once a day from 6:15 a.m. to 6:40 a.m.  This express operates back and forth between only the Midland Park Mall in Midland, Texas, and the Music City Mall in Odessa, Texas.

67.     After 6:40 a.m., MOUTD's EZ Express stops operating.

68.     MOUTD's EZ Express does not coordinate with any other mode of transportation. Its fair price is the same as all other bus lines operated by MOUTD, which is $1.25.

### D.  MOUTD's Complimentary Paratransit Services

69.     MOUTD provides complimentary paratransit service to its M1-M6 and O1-O6 bus lines.  A one-way paratransit trip costs $2.50.

70.     MOUTD does not provide complimentary paratransit along the Midland Connect and Odessa Connect fixed-route bus lines because it considers these bus lines to be commuter bus services.

71.     Per MOUTD's paratransit plan policy, only locations that are three-quarters of a mile within a fixed route bus line are eligible for paratransit trip pick-ups and drop-offs.

72.     MOUTD provides demand response non-paratransit trips between the cities Midland and Odessa for a one-way fee of $5.00.

## IV.  Plaintiff Ms. Uranga Wants to Use Paratransit Service to Travel Back and Forth Between Midland and Odessa

73.     Ms. Uranga is a person with a visual impairment.  Her physical impairment substantially impacts the major life activity of sight.  This is a long-term impairment.  Ms. Uranga also uses a service animal to assist her with her visual impairment.  The service animal is trained to perform specific tasks related to Ms. Uranga's visual impairment and to help her navigate.

74.     Ms. Uranga is a qualified paratransit rider with MOUTD and receives complimentary paratransit rides from MOUTD.

75.     Ms. Uranga lives in Odessa, Texas.  Her home is within three-quarters of a mile of a fixed-route bus line operated by MOUTD.

76.     Ms. Uranga attempted and continues to want to travel via paratransit services from paratransit eligible locations (i.e., within three-quarters of a mile of the nearest fixed-route bus line) in Odessa to paratransit eligible locations (i.e., within three-quarters of a mile of the nearest fixed-route bus line) in Midland, Texas.

77.     MOUTD refuses Ms. Uranga one continuous paratransit trip from her home in Odessa, Texas to locations in Midland, Texas that are within three-quarters of a mile of the M1, M2, M3, M4, M5, or M6 lines and stops.

78.     MOUTD does not provide paratransit services to Ms. Uranga in the same way someone using the fixed-route would receive.

79.     Paratransit services between Odessa and Midland takes longer than riding the fixed-route bus system between the two cities.

80.     MOUTD refuses to provide one continuous trip from Odessa to Midland because it believes the Midland Connect and Odessa Connect are a commuter bus service.  The Midland Connect and Odessa Connect are not a commuter bus service; nor are they used solely as a commuter bus service.

## CAUSES OF ACTION

**I.    Claims Against MOUTD**

**A.  Violations of Title II of the ADA**

81.     The allegations listed in the preceding paragraphs above are incorporated by reference.

82.     Ms. Uranga is a qualified individual with disabilities within the meaning of the ADA. 42 U.S.C. § 12131(2), as she is an individual with a visual impairment that impacts the

following major life activities: sight and independent mobility.  Her physical impairment is substantial and long-term.

83.    Defendant MOUTD is a governmental entity, making it a public entity pursuant to Title II of the ADA.  MOUTD also qualifies as a transit agency under Title II of the ADA.

84.    Pursuant to 42 U.S.C. § 12132, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

85.    Title II of the ADA and implementing regulations establishes a robust framework of transportation requirements for persons with disabilities.  Title II of the ADA prohibits state and local governments that operate public transit agencies (hereinafter "transit agencies") from discriminating against qualified individuals with disabilities in transportation services offered to the public.  Title II, Subtitle B of the ADA applies to state and local governments' transit agencies. 42 U.S.C §§ 12141, *et. seq*.

86.    MOUTD operates a fixed-route bus system.  42 U.S.C. § 12141(3).

87.    Because MOUTD operates a fixed-route bus system, it is required to provide paratransit service for individuals with disabilities as a complement to the fixed-route system.  42 U.S.C. § 12143(a).

88.    Ms. Uranga is a qualified paratransit rider with MOUTD.    42 U.S.C. § 12143(c)(1)(A).

89.    Congress instructed the Secretary of Transportation to issue regulations providing minimum service criteria for paratransit service.  42 U.S.C. § 12143(b) & (c).

90.     A public entity that operates a fixed route bus system, such as MOUTD, must "provide complementary paratransit service to origins and destinations within corridors with a width of three-fourths of a mile on each side of each fixed route."  49 C.F.R. § 37.131(a)(1)(i).

91.     Ms. Uranga is a qualified paratransit eligible rider with MOUTD.  Ms. Uranga lives in Odessa, Texas, and her home is within three-quarters of a mile from a fixed-route bus line operated by MOUTD.  Ms. Uranga attempted to and continues to want to travel via paratransit from her home in Odessa to locations in Midland, Texas that are within three-quarters of a mile of the M1-M6 fixed-route bus lines and stops.

92.     MOUTD, however, refuses to provide Ms. Uranga one continuous paratransit ride even though its fixed-route bus lines in Midland and Odessa are interconnected via the Midland Connect and Odessa Connect as one interconnected bus route system and thus seamlessly connect the two cities.

93.     Neither MOUTD's "Midland Connect" nor "Odessa Connect" are a commuter bus service.  MOUTD is therefore obligated to provide complementary paratransit service along the Midland Connect and Odessa Connect.  To date, however, MOUTD refuses to provide paratransit trips based on an erroneous interpretation and application that its Midland Connect and Odessa Connect are commuter bus services.

94.     In sum, Defendant MOUTD violated and continues to violate Ms. Uranga's rights under the ADA to receive complementary paratransit service between Midland and Odessa, Texas.

95.     Defendant MOUTD's actions and/or inactions described above therefore:

        a.      constitute discrimination in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. Part 35;

b.        fail to provide complimentary paratransit in violation of Title II of the ADA, 42 U.S.C. § 12143, and its implementing regulation, 49 C.F.R Part 37;

c.        exclude individuals with disabilities from participation in and deny them the benefits of the services, programs, or activities of a public entity on the basis of disability, in violation of Title II of the ADA. 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(a);

d.        afford qualified individuals with disabilities an opportunity to participate in or benefit from the services of a public entity that are not equal to those afforded others, in violation of Title II of the ADA, 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(b)(1)(ii);

e.        limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service, in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(b)(1)(vii);

f.        fail to make reasonable modifications in policies, practices, or procedures necessary to avoid discrimination on the basis of disability, in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(b)(7);

g.        utilize methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability, in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(b)(3);

h.        exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association, in violation of Title II

of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(g); and

        i.      interfere with an individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the ADA, in violation of Title V of the ADA, 42 U.S.C. § 12203(b).

96.     MOUTD's violations of Title II of the ADA harmed and will continue to harm Ms. Uranga in the future.

### B.  Violations of the Rehabilitation Act

97.     The allegations listed above above are incorporated by reference.

98.     Ms. Uranga is qualified individual with disabilities under Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act").  29 U.S.C. § 794(a).

99.     MOUTD receives federal financial assistance to operate transportation programs and services designed to provide transportation to Plaintiff.

100.    The regulations accompanying the Rehabilitation Act provide that: "[r]ecipients shall administer programs and activities in the most integrated setting appropriate to the needs of qualified [disabled] persons."  28 C.F.R. § 41.51(d).

101.    These regulations further prohibit recipients of federal financial assistance from "utiliz[ing] criteria or methods of administration . . . (i) [t]hat have the effect of subjecting [disabled] persons to discrimination on the basis of [disability]; [or] (ii) that have the purpose or effect of substantially impairing accomplishment of the objectives of the recipient's program with respect to [disabled] persons."  28 C.F.R. § 41.51(b)(3); 45 C.F.R. § 84.4(b).

102.    MOUTD's criteria and methods of administering their transportation services for persons with disabilities subjects plaintiffs to illegal discrimination and unnecessary segregation in violation of the Rehabilitation Act and its implementing regulations.

103.    Under 29 U.S.C. § 794 and 49 C.F.R. § 27.1, *et seq.*, the Rehabilitation Act prohibits any program or activity receiving federal funding from denying to persons with disabilities, on the basis of disability, the benefits of the program or activity, or from subjecting persons with disabilities to discrimination.

104.    Under 29 U.S.C. § 794(b) a "program or activity" receiving federal funds is defined to include all the operations of "a department, agency, special purpose district, or other instrumentality of a State or local government."

105.    Pursuant to 49 C.F.R. § 27.3, "each recipient of Federal financial assistance from the Department of Transportation and . . . each program or activity that receives such assistance" is subject to 49 C.F.R. § 27.1, *et seq.*, prohibition of discrimination against individuals with disabilities regulations.

106.    Under 29 U.S.C. § 794 and 49 C.F.R. § 27.1, *et seq.*, it is considered discrimination for purposes of the Rehabilitation Act "for a public entity to fail to operate a designated public transportation program or activity conducted in [existing] facilities so that, when viewed in the entirety, the program or activity is readily accessible and usable by individuals with disabilities."

107.    In engaging in the conduct described above, Defendant MOUTD denied Plaintiff the benefits of its services, programs, and activities in violation of 29 U.S.C. § 794 and 49 C.F.R. § 27.1, *et seq.*, on the basis of her disability.  The benefit denied was paratransit services between Odessa and Midland in one continuous trip.

108.    MOUTD's violations of the Rehabilitation Act harmed and will continue to harm Ms. Uranga in the future.

## II.    Claims Against City of Odessa

### A.  Violations of Title II of the ADA

109.    The allegations listed in paragraphs 1–111 above are incorporated by reference.

110.    Ms. Uranga is a qualified individual with disabilities within the meaning of the ADA. 42 U.S.C. § 12131(2), as she is an individual with a visual impairment that impacts the following major life activities: sight and independent mobility.  Her physical impairment is long-term and substantial.

111.    Odessa is a governmental entity, making it a public entity pursuant to Title II of the ADA.

112.    Pursuant to 42 U.S.C. § 12132, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

113.    Title II of the ADA and implementing regulations establishes a robust framework of transportation requirements for persons with disabilities.  Title II of the ADA prohibits state and local governments that operate public transit agencies (hereinafter "transit agencies") from discriminating against qualified individuals with disabilities in transportation services offered to the public. Title II, Subtitle B of the ADA applies to state and local governments' transit agencies. 42 U.S.C §§ 12141, *et. seq*.

114.    Defendant Odessa provides transportation services by overseeing and controlling MOUTD.  MOUTD operates fixed-route bus systems.  42 U.S.C. § 12141(3).

115. Because MOUTD operates a fixed-route bus system, it is required to provide paratransit service for individuals with disabilities as a complement to the fixed-route system. 42 U.S.C. § 12143(a).

116. Ms. Uranga is a qualified paratransit rider with MOUTD. 42 U.S.C. § 12143(c)(1)(A).

117. Congress instructed the Secretary of Transportation to issue regulations providing minimum service criteria for paratransit service. 42 U.S.C. § 12143(b) & (c).

118. A public entity that operates a fixed route, such as MOUTD, must "provide complementary paratransit service to origins and destinations within corridors with a width of three-fourths of a mile on each side of each fixed route." 49 C.F.R. § 37.131(a)(1)(i).

119. Ms. Uranga is a qualified paratransit eligible rider with MOUTD. Ms. Uranga lives in Odessa, Texas, and her home is within three-quarters of a mile from a fixed-route operated by MOUTD. Ms. Uranga attempted to and continues to want to travel from her home in Odessa, which is within three-quarters of a mile of the nearest fixed-route line, to locations in Midland, Texas that are within three-quarters of a mile of the M1-M6 fixed-route bus lines and stops.

120. MOUTD, however, refuses to provide Ms. Uranga one continuous paratransit ride even though its fixed-routes in Midland and Odessa are interconnected via the Midland Connect and Odessa Connect as one interconnected bus route system.

121. Neither MOUTD's "Midland Connect" nor "Odessa Connect" are a commuter bus service. MOUTD is therefore obligated to provide complimentary paratransit service along the Midland Connect and Odessa Connect, therefore permitting paratransit riders to travel between Midland and Odessa in one continuous paratransit trip. To date, however, MOUTD refuses to

provide these paratransit trips based on an erroneous interpretation and application that its Midland Connect and Odessa Connect are commuter bus service lines.

122.    In sum, Defendant MOUTD violated and continues to violate Ms. Uranga's rights under the ADA to receive complimentary paratransit service between Midland and Odessa, Texas.

123.    In turn, Defendant City Odessa is responsible for MOUTD's actions and/or inactions as it retains control over MOUTD after creating it.

124.    Defendant Odessa's actions and/or inactions described above therefore:

        a.      constitute discrimination in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. Part 35;

        b.      fail to provide complimentary paratransit in violation of Title II of the ADA, 42 U.S.C. § 12143, and its implementing regulation, 49 C.F.R Part 37

        c.      exclude individuals with disabilities from participation in and deny them the benefits of the services, programs, or activities of a public entity on the basis of disability, in violation of Title II of the ADA. 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(a);

        d.      afford qualified individuals with disabilities an opportunity to participate in or benefit from the services of a public entity that are not equal to those afforded others, in violation of Title II of the ADA, 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(b)(1)(ii);

        e.      limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service, in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(b)(1)(vii);

f.      fail to make reasonable modifications in policies, practices, or procedures necessary to avoid discrimination on the basis of disability, in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(b)(7);

g.      utilize methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability, in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(b)(3);

h.      exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association, in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(g); and

i.      interfere with an individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the ADA, in violation of Title V of the ADA, 42 U.S.C. § 12203(b).

125.    Defendant Odessa's violations of Title II of the ADA harmed and will continue to harm Ms. Uranga in the future.

**B. Violations of the Rehabilitation Act**

126.    The allegations listed in the above paragraphs above are incorporated by reference.

127.    Ms. Uranga is qualified individual with disabilities under Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act").  29 U.S.C. § 794(a).

128.     Defendant Odessa receives federal financial assistance to operate transportation programs and services designed to provide transportation services and supports to the plaintiff.

129.     The regulations accompanying Rehabilitation Act provide that: "[r]ecipients shall administer programs and activities in the most integrated setting appropriate to the needs of qualified [disabled] persons."  28 C.F.R. § 41.51(d).

130.     These regulations further prohibit recipients of federal financial assistance from "utiliz[ing] criteria or methods of administration . . . (i) [t]hat have the effect of subjecting [disabled] persons to discrimination on the basis of [disability]; [or] (ii) that have the purpose or effect of substantially impairing accomplishment of the objectives of the recipient's program with respect to [disabled] persons."  28 C.F.R. § 41.51(b)(3); 45 C.F.R. § 84.4(b).

131.     Odessa created and retains control over MOUTD.  MOUTD's criteria and methods of administering their transportation services for persons with disabilities subjects plaintiffs to illegal discrimination and unnecessary segregation in violation of § 504 of the Rehabilitation Act and its implementing regulations.

132.     Under 29 U.S.C. § 794 and 49 C.F.R. § 27.1, *et seq.*, the Rehabilitation Act prohibits any program or activity receiving federal funding from denying to persons with disabilities, on the basis of disability, the benefits of the program or activity, or from subjecting persons with disabilities to discrimination.

133.     Under 29 U.S.C. § 794(b) a "program or activity" receiving federal funds is defined to include all the operations of "a department, agency, special purpose district, or other instrumentality of a State or local government."

134.     Pursuant to 49 C.F.R. § 27.3, "each recipient of Federal financial assistance from the Department of Transportation and . . . each program or activity that receives such assistance"

is subject to 49 C.F.R. § 27.1, *et seq.*, prohibition of discrimination against individuals with disabilities regulations.

135.     Under 29 U.S.C. § 794 and 49 C.F.R. § 27.1, *et seq.* it is considered discrimination for purposes of the Rehabilitation Act "for a public entity to fail to operate a designated public transportation program or activity conducted in [existing] facilities so that, when viewed in the entirety, the program or activity is readily accessible and usable by individuals with disabilities."

136.     In engaging in the conduct described above, Defendant MOUTD denied Plaintiff the benefits of its services, programs, and activities in violation of 29 U.S.C. § 794 and 49 C.F.R. § 27.1, *et seq.*, on the basis of her disability.  The benefit denied was paratransit services between Odessa and Midland in one continuous trip.

137.     Defendant Odessa is responsible for MOUTD's actions and inactions.

138.     Defendant Odessa's violations of the Rehabilitation Act harmed and will continue to harm Ms. Uranga in the future.

## III.     Claims Against the City of Midland

### A.  Violations of Title II of the ADA

139.     The allegations listed in the above are incorporated by reference.

140.     Ms. Uranga is a qualified individual with disabilities within the meaning of the ADA. 42 U.S.C. § 12131(2), as she is an individual with a visual impairment that impacts the following major life activities: sight and independent mobility.  The physical impairment is long-term and substantial.

141.     Midland is a governmental entity, making it a public entity pursuant to Title II of the ADA.

142.    Pursuant to 42 U.S.C. § 12132, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

143.    Title II of the ADA and implementing regulations establishes a robust framework of transportation requirements for persons with disabilities.  Title II of the ADA prohibits state and local governments that operate public transit agencies (hereinafter "transit agencies") from discriminating against qualified individuals with disabilities in transportation services offered to the public. Title II, Subtitle B of the ADA applies to state and local governments' transit agencies. 42 U.S.C §§ 12141, *et. seq*.

144.    Defendant Midland provides transportation services by overseeing and controlling MOUTD.  MOUTD operates fixed-route bus systems.  42 U.S.C. § 12141(3).

145.    Because MOUTD operates a fixed-route bus system, it is required to provide paratransit service for individuals with disabilities as a complement to the fixed-route system.  42 U.S.C. § 12143(a).

146.    Ms. Uranga is a qualified paratransit rider with MOUTD.    42 U.S.C. § 12143(c)(1)(A).

147.    Congress instructed the Secretary of Transportation to issue regulations providing minimum service criteria for paratransit service.  42 U.S.C. § 12143(b) & (c).

148.    A public entity that operates a fixed route, such as MOUTD, must "provide complementary paratransit service to origins and destinations within corridors with a width of three-fourths of a mile on each side of each fixed route."  49 C.F.R. § 37.131(a)(1)(i).

149.    Ms. Uranga is a qualified paratransit eligible rider with MOUTD.  Ms. Uranga lives in Odessa, Texas, and her home is within three-quarters of a mile from a fixed-route operated by

MOUTD.  Ms. Uranga attempted to and continues to want to travel from her home in Odessa, which is within three-quarters of a mile of the nearest fixed-route line, to locations in Midland, Texas that are within three-quarters of a mile of the M1-M6 fixed-route bus lines and stops.

150.   MOUTD, however, refuses to provide Ms. Uranga one continuous paratransit ride even though its fixed-routes in Midland and Odessa are interconnected via the "Midland Connect" and "Odessa Connect" as one interconnected bus route system.

151.   Neither MOUTD's "Midland Connect" nor "Odessa Connect" are a commuter bus service, and therefore, MOUTD is obligated to provide complimentary paratransit service along the Midland Connect and Odessa Connect, therefore permitting paratransit riders to travel between Midland and Odessa in one continuous paratransit trip.  To date, however, MOUTD refuses to provide these paratransit trips based on an erroneous interpretation and application that its Midland Connect and Odessa Connect are commuter bus service lines.

152.   In sum, Defendant MOUTD violated and continues to violate Ms. Uranga's rights under the ADA to receive complimentary paratransit service between Midland and Odessa, Texas.

153.   In turn, Defendant Midland is responsible for MOUTD's actions and/or inactions. Midland created and retains control over MOUTD.

154.   Defendant Midland's actions and/or inactions described above therefore:

a.     constitute discrimination in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. Part 35;

b.     fail to provide complimentary paratransit in violation of Title II of the ADA, 42 U.S.C. § 12143, and its implementing regulation, 49 C.F.R Part 37

c.     exclude individuals with disabilities from participation in and deny them the benefits of the services, programs, or activities of a public entity on the basis of

disability, in violation of Title II of the ADA. 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(a);

      d.     afford qualified individuals with disabilities an opportunity to participate in or benefit from the services of a public entity that are not equal to those afforded others, in violation of Title II of the ADA, 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(b)(1)(ii);

      e.     limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service, in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(b)(1)(vii);

      f.     fail to make reasonable modifications in policies, practices, or procedures necessary to avoid discrimination on the basis of disability, in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(b)(7);

      g.     utilize methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability, in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(b)(3);

      h.     exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association, in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(g); and

      i.     interfere with an individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or

encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the ADA, in violation of Title V of the ADA, 42 U.S.C. § 12203(b).

155.    Defendant Odessa's violations of Title II of the ADA harmed and will continue to harm Ms. Uranga in the future.

**B.  Violations of the Rehabilitation Act**

156.    The allegations listed in the above paragraphs are incorporated by reference.

157.    Ms. Uranga is qualified individual with disabilities under Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"). 29 U.S.C. § 794(a).

158.    Defendant Midland receives federal financial assistance to operate transportation programs and services designed to provide transportation services and supports to the plaintiff.

159.    The regulations accompanying the Rehabilitation Act provide that: "[r]ecipients shall administer programs and activities in the most integrated setting appropriate to the needs of qualified [disabled] persons."  28 C.F.R. § 41.51(d).

160.    These regulations further prohibit recipients of federal financial assistance from "utiliz[ing] criteria or methods of administration . . . (i) [t]hat have the effect of subjecting [disabled] persons to discrimination on the basis of [disability]; [or] (ii) that have the purpose or effect of substantially impairing accomplishment of the objectives of the recipient's program with respect to [disabled] persons."  28 C.F.R. § 41.51(b)(3); 45 C.F.R. § 84.4(b).

161.    Midland created and retains control over MOUTD.  MOUTD's criteria and methods of administering their transportation services for persons with disabilities subjects plaintiffs to illegal discrimination and unnecessary segregation in violation of the Rehabilitation Act and its implementing regulations.

162.    Under 29 U.S.C. § 794 and 49 C.F.R. § 27.1, *et seq.*, the Rehabilitation Act prohibits any program or activity receiving federal funding from denying to persons with disabilities, on the basis of disability, the benefits of the program or activity, or from subjecting persons with disabilities to discrimination.

163.    Under 29 U.S.C. § 794(b) a "program or activity" receiving federal funds is defined to include all the operations of "a department, agency, special purpose district, or other instrumentality of a State or local government."

164.    Pursuant to 49 C.F.R. § 27.3, "each recipient of Federal financial assistance from the Department of Transportation and . . . each program or activity that receives such assistance" is subject to 49 C.F.R. § 27.1, *et seq.*, prohibition of discrimination against individuals with disabilities regulations.

165.    Under 29 U.S.C. § 794 and 49 C.F.R. § 27.1, *et seq.* it is considered discrimination for purposes of the Rehabilitation Act "for a public entity to fail to operate a designated public transportation program or activity conducted in [existing] facilities so that, when viewed in the entirety, the program or activity is readily accessible and usable by individuals with disabilities."

166.    In engaging in the conduct described above, Defendant MOUTD denied Plaintiff the benefits of its services, programs, and activities in violation of 29 U.S.C. § 794 and 49 C.F.R. § 27.1, *et seq.*, on the basis of her disability.  The benefit denied was paratransit services between Odessa and Midland in one continuous trip.

167.    Defendant Midland is responsible for MOUTD's actions and inactions.

168.    Defendant Midland's violations of the Rehabilitation harmed and will continue to harm Ms. Uranga in the future.

IV.     **Claims Against RATP**

169.    The allegations listed in the above paragraphs are incorporated by reference.

170.    Ms. Uranga is qualified individual with disabilities under Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act").  29 U.S.C. § 794(a).

171.    Defendant RATP receives federal financial assistance as a subcontractor to manage and operate the day-to-day services of MOUTD's transportation programs designed to provide transportation services and supports to the plaintiff.

172.    The regulations accompanying Rehabilitation Act provide that: "[r]ecipients shall administer programs and activities in the most integrated setting appropriate to the needs of qualified [disabled] persons."  28 C.F.R. § 41.51(d).

173.    These regulations further prohibit recipients of federal financial assistance from "utiliz[ing] criteria or methods of administration . . . (i) [t]hat have the effect of subjecting [disabled] persons to discrimination on the basis of [disability]; [or] (ii) that have the purpose or effect of substantially impairing accomplishment of the objectives of the recipient's program with respect to [disabled] persons."  28 C.F.R. § 41.51(b)(3); 45 C.F.R. § 84.4(b).

174.    Midland created and retains control over MOUTD.  MOUTD's criteria and methods of administering their transportation services for persons with disabilities subjects plaintiffs to illegal discrimination and unnecessary segregation in violation of the Rehabilitation Act and its implementing regulations.

175.    Under 29 U.S.C. § 794 and 49 C.F.R. § 27.1, *et seq.*, Rehabilitation Act prohibits any program or activity receiving federal funding from denying to persons with disabilities, on the basis of disability, the benefits of the program or activity, or from subjecting persons with disabilities to discrimination.

176.    Under 29 U.S.C. § 794(b) a "program or activity" receiving federal funds is defined to include all the operations of "a department, agency, special purpose district, or other instrumentality of a State or local government."

177.    Pursuant to 49 C.F.R. § 27.3, "each recipient of Federal financial assistance from the Department of Transportation and . . . each program or activity that receives such assistance" is subject to 49 C.F.R. § 27.1, *et seq.*, prohibition of discrimination against individuals with disabilities regulations.

178.    Under 29 U.S.C. § 794 and 49 C.F.R. § 27.1, *et seq.*, it is considered discrimination for purposes of the Rehabilitation Act "for a public entity to fail to operate a designated public transportation program or activity conducted in [existing] facilities so that, when viewed in the entirety, the program or activity is readily accessible and usable by individuals with disabilities."

179.    In engaging in the conduct described above, Defendant MOUTD denied Plaintiff the benefits of its services, programs, and activities in violation of 29 U.S.C. § 794 and 49 C.F.R. § 27.1, *et seq.*, on the basis of her disability.  The benefit denied was paratransit services between Odessa and Midland in one continuous trip.

180.    Defendant RATP is responsible for MOUTD's actions and inactions as a subcontractor implementing and following MOUTD's discriminatory paratransit policies.

181.    Defendant RATP's violations of the Rehabilitation Act harmed and will continue to harm Ms. Uranga in the future.

## V.    Claims Against MOTM

182.    The allegations listed in the above paragraphs are incorporated by reference.

183.    Ms. Uranga is qualified individual with disabilities under Section 504 of the Rehabilitation Act of 1973.  29 U.S.C. § 794(a).

184.    Defendant RATP receives federal financial assistance as a subcontractor to manage and operate the day-to-day services of MOUTD's transportation programs designed to provide transportation services and supports to the plaintiff.

185.    The regulations accompanying the Rehabilitation Act provide that: "[r]ecipients shall administer programs and activities in the most integrated setting appropriate to the needs of qualified [disabled] persons."  28 C.F.R. § 41.51(d).

186.    These regulations further prohibit recipients of federal financial assistance from "utiliz[ing] criteria or methods of administration . . . (i) [t]hat have the effect of subjecting [disabled] persons to discrimination on the basis of [disability]; [or] (ii) that have the purpose or effect of substantially impairing accomplishment of the objectives of the recipient's program with respect to [disabled] persons."  28 C.F.R. § 41.51(b)(3); 45 C.F.R. § 84.4(b).

187.    Midland created and retains control over MOUTD.  MOUTD's criteria and methods of administering their transportation services for persons with disabilities subjects plaintiffs to illegal discrimination and unnecessary segregation in violation of the Rehabilitation Act and its implementing regulations.

188.    Under 29 U.S.C. § 794 and 49 C.F.R. § 27.1, *et seq.*, the Rehabilitation Act prohibits any program or activity receiving federal funding from denying to persons with disabilities, on the basis of disability, the benefits of the program or activity, or from subjecting persons with disabilities to discrimination.

189.    Under 29 U.S.C. § 794(b) a "program or activity" receiving federal funds is defined to include all the operations of "a department, agency, special purpose district, or other instrumentality of a State or local government."

190.    Pursuant to 49 C.F.R. § 27.3, "each recipient of Federal financial assistance from the Department of Transportation and . . . each program or activity that receives such assistance" is subject to 49 C.F.R. § 27.1, *et seq.*, prohibition of discrimination against individuals with disabilities regulations.

191.    Under 29 U.S.C. § 794 and 49 C.F.R. § 27.1, *et seq.*, it is considered discrimination for purposes of the Rehabilitation Act "for a public entity to fail to operate a designated public transportation program or activity conducted in [existing] facilities so that, when viewed in the entirety, the program or activity is readily accessible and usable by individuals with disabilities."

192.    In engaging in the conduct described above, Defendant MOUTD denied Plaintiff the benefits of its services, programs, and activities in violation of 29 U.S.C. § 794 and 49 C.F.R. § 27.1, *et seq.*, on the basis of her disability.  The benefit denied was paratransit services between Odessa and Midland in one continuous trip.

193.    Defendant RATP is responsible for MOUTD's actions and inactions as a subcontractor implementing and following MOUTD's discriminatory paratransit policies.

194.    Defendant RATP's violations of Rehabilitation Act harmed and will continue to harm Ms. Uranga in the future.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

A.    That this Court issue a permanent injunction ordering Defendants MOUTD, Midland, Odessa, MOTM, and RATP, including their agents, servants, and employees, to develop and implement changes to its complimentary paratransit plan and provide Ms. Uranga paratransit service between Midland and Odessa, Texas.

B.      That this Court order a declaratory judgment, specifying Defendants' violations of her transportation rights under the ADA, including that the "Midland Connect" and "Odessa Connect" bus lines are not commuter bus services and therefore must have complimentary paratransit service associated with these lines;

C.      Defendant MOUTD adopt and implement an ADA/Rehabilitation Act coordinator position;

D.      Defendants undergo training regarding disability rights under Title II of the ADA and Rehabilitation Act and those statutes' implementing regulations;

E.      That this Court order Defendants to pay Plaintiff his reasonable attorney's fees, costs, and expenses pursuant to 42 U.S.C. §§ 1988 and 12205; and

F.      That this Court grant such other relief as may be just, equitable, and proper.


DATED: January 27 , 2020

                                        Respectfully submitted,

                                        DISABILITY RIGHTS TEXAS

                                         *s/Christopher McGreal*
                                        CHRISTOPHER P. MCGREAL
                                        TX State Bar No. 24051774
                                        1420 Mockingbird Lane, Suite 450
                                        Dallas, Texas 75247
                                        (214) 845-4056 (Phone)
                                        (214) 630-3472 (Fax)
                                        cmcgreal@drtx.org

                                        RACHEL B. COHEN-MILLER
                                        TX State Bar No. 24064301
                                        1420 Mockingbird Lane, Suite 450
                                        Dallas, Texas 75247
                                        (214) 845-4069 (Phone)
                                        (214) 630-3472 (Fax)
                                        rmiller@drtx.org

LEGAL AID OF NORTHWEST TEXAS

MARK OUALLINE*
TX State Bar No. 24088166
1001 Main St., Ste. 502
Lubbock, Texas 79401
(806) 763-4557 ext. 6050 (Phone)
(806) 765-7201 (Fax)
ouallinem@lanwt.org

MARVILYN E. B. BOHANNAN*
NC Bar No.: 54338
Legal Aid of NorthWest Texas
620 N. Grant Ave., Suite 410
Odessa, Texas 79761
(432) 332-1207, ext. 4504 (Phone)
(432) 334- 6848 (Fax)
bohannanm@lanwt.org

*Attorneys for Plaintiff*
*Yadira Uranga*

*Pro Hac Vice Application to be filed